FILED
United States Court of Appeals
Tenth Circuit

August 27, 2012

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

ARMANDO L. RAMOS,

      Defendant - Appellant.

No. 11-3126

---

**Appeal from the United States District Court
for the District of Kansas
(D.C. No. 6:10-CR-10112-MLB-1)**

---

John K. Henderson, Jr., Assistant Federal Public Defender, Wichita, Kansas, for
Defendant-Appellant.

James A. Brown, Assistant U.S. Attorney (Barry R. Grissom, U.S. Attorney, with
him on the brief), Topeka, Kansas, for Plaintiff-Appellee.

---

Before **HARTZ**, **HOLLOWAY**, and **HOLMES**, Circuit Judges.

---

**HOLMES**, Circuit Judge.

Armando Ramos attacks in this appeal the legal validity of his sentence for

receipt of child pornography, in violation of 18 U.S.C. § 2252(a)(2). For the

reasons that follow, we affirm in part and dismiss the appeal in part for lack of

subject-matter jurisdiction.

## I

Mr. Ramos was indicted by a federal grand jury in Kansas on two counts relating to the receipt and possession of child pornography. The charges arose out of an investigation that began with a tip from German authorities who were "policing the [e]Donkey peer-to-peer file sharing network and observed a known child pornography file available for download" at an IP address that was later traced by Immigrations and Customs Enforcement ("ICE") to Mr. Ramos. R., Vol. 3, at 24 (Plea Hr'g, held Dec. 6, 2010). ICE executed a search warrant at Mr. Ramos's home; they seized multiple computers, hard drives, DVDs, and CDs containing thousands of images and videos of child pornography.

During the search, an investigator interviewed Mr. Ramos. He admitted to being the sole user of the computers in his home, and to using eMule, the "specific program that . . . access[es] the [e]Donkey network," as a vehicle for obtaining child pornography. *Id.* at 24–25. When a user initiates a download, the eMule program automatically places the material into shared folders, accessible to other Internet users. However, Mr. Ramos told the ICE agent that he always attempted to transfer his child-pornography files out of the shared eMule folders. And the government presented no evidence that any of the shared folders contained child pornography.

Mr. Ramos entered a plea of guilty without a formal plea agreement to

-2-

Count One of a two-count Indictment, which charged him with "knowingly and intentionally receiv[ing] . . . [child pornography]" in violation of 18 U.S.C. § 2252(a)(2).  R., Vol. 1, at 8 (Indictment, filed July 20, 2010); *see id.* at 10–14 (Pet. to Enter Plea of Guilty & Order Entering Plea, filed Dec. 13, 2010).  Count Two (possession or access with intent to view child pornography, 18 U.S.C. § 2252(a)(4)(B)) was later dismissed.

The U.S. Probation Office prepared a Presentence Investigation Report ("PSR"); it set Mr. Ramos's base offense level at twenty-two pursuant to § 2G2.2(a)(2) of the U.S. Sentencing Guidelines ("U.S.S.G.").[1]  R., Vol. 2, at 112–13 (PSR, prepared Jan. 21, 2011, revised Feb. 14, 2011).  The PSR also recommended numerous specific-offense enhancements, including, as relevant here, a five-level enhancement under § 2G2.2(b)(3)(B) because the crime involved "[d]istribut[ion of child pornography] . . . for the receipt, or expectation of receipt, of a thing of value, but not for pecuniary gain."  *Id.* at 113.  After accounting for acceptance of responsibility, Mr. Ramos's total recommended offense level was thirty-seven.  The PSR assigned Mr. Ramos a criminal history category of I.  The resulting advisory Guidelines sentencing range (derived from

---

[1]     The PSR used the version of the Guidelines effective November 1, 2010.  R., Vol. 2, at 112. The parties do not contest that use; accordingly, we rely on the November 2010 version of the Guidelines here.

the offense level and criminal history) was 210 to 240 months.[2]

Mr. Ramos raised multiple objections to the PSR. Pertinently, he objected to the five-level enhancement under § 2G2.2(b)(3)(B), and the PSR's corresponding failure to apply a two-level reduction for "non"-distribution under § 2G2.2(b)(1). He further argued that the five-year mandatory-minimum sentence prescribed by 18 U.S.C. § 2252(b)(1) violates the Equal Protection Clause of the Fifth Amendment because it punishes "receipt" of child pornography much more harshly than the allegedly comparable crime of "possession." Finally, he argued that the mandatory minimum for the receipt offense violates the Sixth Amendment because it is inconsistent with the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005). This is so, Mr. Ramos reasoned, because the mandatory-minimum penalty prevents the trial court from imposing a sentence for a receipt offense that is uniform with a sentence that it would be authorized to impose for a possession offense, which involves conduct that is "relatively, if not completely, the same" as the receipt offense. R., Vol. 2, at 17 (Obj. to the PSR and Sentencing Mem., filed Feb. 14, 2011).

---

[2] An offense level of thirty-seven and a criminal history category of I ordinarily yield a Guidelines range of 210 to 262 months. However, Mr. Ramos was convicted under 18 U.S.C. § 2252(a)(2), which prescribes a statutory maximum imprisonment term of twenty years (i.e., 240 months). *See id.* § 2252(b)(1). Thus, pursuant to U.S.S.G. § 5G1.1(c)(1), the applicable Guidelines range was capped at 240 months. Further, § 2252(b)(1) prescribes a statutory mandatory-minimum sentence of five years' imprisonment for "receipt" convictions.

After conducting a hearing, the district court issued a written letter to counsel ruling on many of Mr. Ramos's objections. The court first applied the two-level enhancement under § 2G2.2(b)(3)(F) for basic "distribution" of child pornography, instead of adopting the PSR's recommendation of the five-level enhancement under § 2G2.2(b)(3)(B). It rejected, however, Mr. Ramos's argument that there was no evidence of any form of "distribution" of child pornography within the meaning of § 2G2.2(b). Consequently, it declined to apply the two-level reduction in § 2G2.2(b)(1).

The court also rejected Mr. Ramos's arguments regarding the alleged unconstitutionality of the mandatory-minimum provision of 18 U.S.C. § 2252(b)(1). Nonetheless, the court did sustain many of Mr. Ramos's objections on matters that are not at issue in this appeal. The court ultimately arrived at a final Guidelines range of seventy to eighty-seven months, which was derived from a total offense level of twenty-seven and a criminal history category of I. The court sentenced Mr. Ramos to a prison term at the top of that range, that is, eighty-seven months. Mr. Ramos filed a timely notice of appeal.

## II

On appeal, Mr. Ramos raises three issues. First, he contends that there was an insufficient basis for the district court to conclude that he "distributed" child pornography under § 2G2.2(b) by virtue of his use of eMule. Second, he argues that the mandatory-minimum sentence applied to his case, *see* 18 U.S.C. §

2252(b)(1), violates the Equal Protection Clause of the Fifth Amendment because it punishes more severely receivers of child pornography than possessors of child pornography, even though there allegedly is no practical difference between the acts of receipt and possession. Finally, he contends that the mandatory minimum runs afoul of the Sixth Amendment and, more specifically, the Supreme Court's decision in *Booker* because it prevents trial courts from imposing sentences for receipt of child pornography that are uniform with sentences that would be imposed for possession.

For the reasons explicated below, we reject Mr. Ramos's first, Guidelines-based argument as unpersuasive and dismiss the remainder of his appeal involving his constitutional challenges for lack of subject-matter jurisdiction. As to the latter disposition, we conclude that Mr. Ramos does not have standing to challenge the five-year mandatory-minimum sentence prescribed by 18 U.S.C. § 2252(b)(1).

## A

Mr. Ramos argues that he did not "distribute" child pornography for purposes of U.S.S.G. § 2G2.2(b). The district court ruled to the contrary. Consequently, Mr. Ramos was denied a two-level reduction under § 2G2.2(b)(1) and received a two-level enhancement under § 2G2.2(b)(3)(F). The district court found that Mr. Ramos had made child-pornography files available for sharing, conduct that constituted "distribution" under the applicable Guidelines provisions.

Mr. Ramos's argument relates to the procedural reasonableness of his sentence because he contests the district court's calculation of his Guidelines sentencing range. *See United States v. Halliday*, 665 F.3d 1219, 1222 (10th Cir. 2011) ("Defendant argues that the district court erred *procedurally* in applying [a] sentencing guideline . . . ." (emphasis added)); *United States v. Lente*, 647 F.3d 1021, 1030 (10th Cir. 2011) ("[A] procedural challenge relates to the 'method by which the sentence is calculated.'" (quoting *United States v. Wittig*, 528 F.3d 1280, 1284 (10th Cir. 2008))); *see also United States v. McGehee*, 672 F.3d 860, 874 (10th Cir. 2012) (citing authorities). "We review a sentence for abuse of discretion" and, in doing so, "review the court's legal conclusions de novo and its factual findings for clear error." *United States v. Burgess*, 576 F.3d 1078, 1101 (10th Cir. 2009); *see Halliday*, 665 F.3d at 1222–23 ("When reviewing the district court's calculation of the guidelines, we review legal questions de novo and factual findings for clear error, giving due deference to the district court's application of the guidelines to the facts." (quoting *United States v. Mollner*, 643 F.3d 713, 714 (10th Cir. 2011)) (internal quotation marks omitted)). "The government bears the burden of proving sentencing enhancements by a preponderance of the evidence." *United States v. Orr*, 567 F.3d 610, 614 (10th Cir. 2009).

Under the Guidelines, the court should apply a two-level reduction to the defendant's base offense level where "[his] conduct was *limited to the receipt or*

*solicitation*" of child pornography and the defendant did not intend to "distribute" such material. U.S.S.G. § 2G2.2(b)(1) (emphasis added); *see Burgess*, 576 F.3d at 1102 ("The wording of U.S.S.G. § 2G2.2(b)(1) is neither complicated nor ambiguous." (quoting *United States v. Fore*, 507 F.3d 412, 415 (6th Cir. 2007))). Additionally, § 2G2.2(b)(3)(F) provides for a two-level *enhancement* in the defendant's base offense level where he otherwise engages in basic "distribution"—*viz.*, distribution that, for instance, does not involve the expectation of receiving something of value in return, *see* § 2G2.2(b)(3)(B), or is not directed to a minor, *id.* § 2G2.2(b)(3)(C).

We must resolve a key Guidelines interpretation issue. Specifically, we must determine the meaning of "distribution" under § 2G2.2(b) because Mr. Ramos's arguments here turn on whether he in fact distributed child pornography. Our inquiry into the meaning of the word "distribution" is a legal exercise; we accordingly perform it de novo. *See Burgess*, 576 F.3d at 1101; *United States v. Thompson*, 281 F.3d 1088, 1090 (10th Cir. 2002) ("We review de novo a district court's legal interpretation of the guidelines."); *cf. United States v. Peña-Hermosillo*, 522 F.3d 1108, 1114 (10th Cir. 2008) ("We review legal determinations, such as whether or not a certain action constitutes [conduct warranting an enhancement under the Guidelines], de novo, and factual determinations, such as whether that action occurred, for clear error." (citations omitted)).

-8-

Mr. Ramos suggests that the Guidelines require an accompanying showing of *intent to distribute* illicit material in order to establish "distribution." *See* Aplt. Opening Br. at 10, 13–14 ("If the material identified by the government . . . was available in one of the folders . . . , there were many reasons why the material was there unrelated to an intent to distribute."). We disagree. Section 2G2.2's commentary defines "distribution" as "*any act*, including possession with intent to distribute, production, transmission, advertisement, and transportation, *related to* the transfer of material involving the sexual exploitation of a minor." U.S.S.G. § 2G2.2 cmt. n.1 (emphases added). And we view that definition as controlling here. *See United States v. Koufos*, 666 F.3d 1243, 1250 (10th Cir. 2011) ("Commentary to the Guidelines is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." (quoting *United States v. Charles*, 576 F.3d 1060, 1066 (10th Cir. 2009)) (internal quotation marks omitted)).

While the commentary states that "distribution" encompasses conduct involving "intent" or "purpose," it plainly states that "*any act . . . related to* the transfer of material involving the sexual exploitation of a minor" constitutes "distribution." U.S.S.G. § 2G2.2 cmt. n.1 (emphases added); *see also United States v. Farrow*, 277 F.3d 1260, 1266 (10th Cir. 2002) (finding guidance in the "plain language of the commentary" of a Guidelines provision). The intent-related examples that the commentary sets forth—e.g., "possession with intent to

distribute"—are preceded by the word, "including," U.S.S.G. § 2G2.2 cmt. n.1, suggesting that the list of outlawed conduct is non-exhaustive, *see Singh-Kaur v. Ashcroft*, 385 F.3d 293, 298 (3d Cir. 2004) ("Use of the term 'including' suggests that Congress intended to illustrate a broad concept rather than narrowly circumscribe a term with exclusive categories."); Bryan A. Garner, *A Dictionary of Modern Legal Usage* 431 (Oxford Univ. Press 2d ed. 1995) (noting that the term "including" "should not be used to introduce an exhaustive list, for it implies that the list is only partial").

Moreover, § 2G2.2 broadly sets forth the definition of "distribution" as "any act . . . *related* to the *transfer* of" child pornography. U.S.S.G. § 2G2.2 cmt. n.1 (emphases added). "Related" is defined as "having similar properties." Webster's Third New International Dictionary 1916 (1981). And as germane here, the word "transfer" commonly means "an act, process, or instance" of moving information from one place to another. *Id.* at 2427. Thus, for example, "distribution" of child pornography would include any act that had similar properties to an act that involved the movement of child pornography from one place to another. Furthermore, in illustration of § 2G2.2's relatively expansive reach, § 2G2.2's commentary notes that the mere passive "posting" of material in a publicly accessible website constitutes distribution without a requirement that the poster have any intent that the material *will be transferred*—or that the poster actually transfer the material to someone else. *See* U.S.S.G. § 2G2.2 cmt. n.1.

-10-

Indeed, several other circuits have adopted a broad construction of § 2G2.2, declining to make an intent-to-distribute determination a prerequisite for a finding of "distribution." *See, e.g.*, *United States v. Bolton*, 669 F.3d 780, 782 (6th Cir. 2012) (suggesting agreement with the decisions of "[a]t least two circuits" which "appear to hold that the government may prove distribution merely by showing that the defendant knowingly used a peer-to-peer file-sharing program to download child pornography"); *United States v. Layton*, 564 F.3d 330, 335 & n.2 (4th Cir. 2009) (holding that "distribution" under § 2G2.2 includes the knowing "use of a peer-to-peer file-sharing program" that allows third-parties to access child pornography files (quoting U.S.S.G. § 2G2.2 cmt. n.1) (internal quotation marks omitted)); *United States v. Carani*, 492 F.3d 867, 876 (7th Cir. 2007) ("The notion that [the defendant] could knowingly make his child pornography available for others to access and download without this qualifying as 'distribution' does not square with the plain meaning of the word.").

In light of the foregoing, we hold that an *intent to distribute* is not required for an act to qualify as "distribution" under § 2G2.2(b). More specifically, we conclude under these facts that when an individual uses a peer-to-peer network file-sharing program with knowledge that the program will deposit downloaded child-pornography files into a shared folder accessible to other users—e.g., rendering files only a mouse-click away—then that person has engaged in an act

related to the transfer of child pornography.[3]  In other words, he has distributed

child pornography within the meaning of § 2G2.2(b).  Such an individual need not

possess concomitantly an *intent to distribute* in order to perform an act of

distribution that § 2G2.2(b) deems culpable.

Mr. Ramos places noteworthy reliance on the Eighth Circuit's decision in

*United States v. Durham*, 618 F.3d 921 (8th Cir. 2010).  It is not patent, however,

that *Durham* varies significantly from the path we chart here.  After thoroughly

reviewing its prior cases, the *Durham* court reversed the district court because,

"contrary to [its] precedent," the court had "automatically imposed the

enhancement because [the defendant] used a file-sharing program," "[r]ather than

deciding the merits of the enhancement on an individualized basis under the

facts."  618 F.3d at 931.  We do not quarrel with that specific conclusion.

To be sure, the *Durham* court also noted that, absent direct evidence of

distribution, such as a defendant's admission that he distributed child

pornography, "[t]he primary means of indirect evidence provided in [its] prior

cases ha[d] been the defendant's sophistication with the file-sharing program."

*Id.* at 929.  The reasoning behind this, said the court, is that "[s]uch sophistication

provides an inference that the defendant knew 'by using a file-sharing network,

---

[3]     Whether the government could ever establish distribution under U.S.S.G. § 2G2.2(b), where a defendant used a peer-to-peer file-sharing program but possessed some lesser degree of knowledge is not a question we need consider here.

he could download files from others who *could also access his files*.'" *Id.* (emphasis added) (quoting *United States v. Bastian*, 603 F.3d 460, 466 (8th Cir. 2010)).  The *Durham* court concluded that there was no direct evidence of distribution and the record did not support the finding that the defendant was a sophisticated user of the file-sharing program, such that he understood it permitted others to access his child-pornography files.  *Id.* at 928–30.

Like *Durham*, there is no direct evidence here of distribution.  However, even if (as in *Durham*) indirect proof of Mr. Ramos's sophisticated knowledge of his eMule file-sharing program were required, we would have no difficulty concluding that the district court did not err in finding that he had distributed child pornography under § 2G2.2(b).  This is so because the government offered sufficient evidence that Mr. Ramos had sophisticated knowledge concerning the properties of his eMule file-sharing program—including the fact that it permitted others to access from his shared folders downloaded child-pornography.  Indeed, Mr. Ramos has acknowledged that "there is no evidence of ignorance in Mr. Ramos'[s] case."  Aplt. Opening Br. at 13.

The district court summarized the government's evidence in its rejection of Mr. Ramos's relevant objection to the PSR:

> Keeping in mind that the government's burden is by preponderance of the evidence, . . . the facts are that defendant is a sophisticated computer user who accessed large amounts of child pornography over a long period using a file sharing program.  It is reasonable to infer from his use of the program,

his sophistication, and his statements to [an ICE agent], that he understood how to place the pornographic images he downloaded in a file which could *not* be accessed by others. The contrary inference that he inadvertently or mistakenly or for some other innocent reason did not move the materials [to such an inaccessible file] is not reasonable.

R., Vol. 1, at 433 (Ltr. to Counsel of Record from Judge Belot, dated Apr. 13, 2011) (emphasis added). We discern no "clear error" in the foregoing factual findings. *See Orr*, 567 F.3d at 614–15; *see United States v. Dodd*, 598 F.3d 449, 451 (8th Cir. 2010) (emphasizing the "fact-intensive" nature of the inquiry regarding whether the government has met its burden in establishing the factual predicate of "distribution" under § 2G2.2). Given these facts, we have no difficulty concluding, even under the reasoning of *Durham*, that Mr. Ramos engaged in "an[] act . . . *related* to the *transfer* of [illicit] material." U.S.S.G. § 2G2.2 cmt. n.1 (emphases added).

Mr. Ramos claims that there must be "[some] *affirmative act* on the part of the defendant to make the material available." Aplt. Opening Br. at 11 (emphasis added). In this regard, he makes much of the alleged difference between eMule and other programs that access peer-to-peer networks because, as his own expert witness opined, "[t]he user does not direct [incoming material] to [shared] folders." Aplt. Opening Br. at 10. Rather, he contends, eMule operates to automatically share files that are downloaded through standard "temp" and "incoming" folders available on every computer that accesses the network. Thus,

-14-

an eMule user has "no way to download . . . material without going through [shared] folders." *Id.* at 12. For support, Mr. Ramos relies upon our decision in *United States v. Geiner*, 498 F.3d 1104 (10th Cir. 2007), and on *Geiner*'s explication of the holding of an earlier Tenth Circuit decision, *United States v. Shaffer*, 472 F.3d 1219 (10th Cir. 2007).

Mr. Ramos's affirmative-act argument is unavailing. First, his reliance on *Shaffer* and *Geiner* is misplaced. In *Shaffer*, we considered whether a defendant had "distribute[d]" child pornography within the meaning of 18 U.S.C. § 2252A(a)(2), where he "downloaded images and videos from a peer-to-peer computer network and stored them in a shared folder on his computer . . . ." 472 F.3d at 1220 (internal quotation marks omitted). The particular file-sharing program at issue (Kazaa) permitted an individual's "shared folder [to] be accessed . . . by other . . . users." *Id.* at 1221. We concluded that while the defendant in that case did not "actively push[]" child pornography, he "freely allowed [others] access to his computerized stash of images and videos," and as such, resembled "the owner of a self-serve gas station." *Id.* at 1223–24; *see Geiner*, 498 F.3d at 1109 (noting that in *Shaffer* "[w]e likened a defendant who makes computer files available in this manner to the owner of a self-serve gas station"). In this regard, we noted that the defendant knew that others could access the child pornography and he admitted that "he could have, but did not, activate the feature on Kazaa that would have precluded others from taking materials from his shared folder."

*Shaffer*, 472 F.3d at 1224.  Accordingly, we upheld the defendant's conviction under § 2252A(a)(2).

In *Geiner*, we considered the meaning of "[d]istribution [of child pornography] for the receipt, or expectation of receipt, of a thing of value, but not for pecuniary gain" under U.S.S.G. § 2G2.2(b)(3)(B).  *See Geiner*, 498 F.3d at 1108 (first alteration in original) (quoting U.S.S.G. § 2G2.2(b)(3)(B)) (internal quotation marks omitted).  Significantly, the defendant did not dispute that he distributed child pornography within the meaning of § 2G2.2(b)(3), as well as 18 U.S.C. § 2252A.  Defendant admitted to adjusting the settings on his software program to allow users to download child pornography.  He did so because he "had learned that he could download files from others at a faster speed if he permitted others to obtain files from him."  *Id.* at 1106.  Defendant maintained, however, that this conduct did not make him eligible for the five-level enhancement under § 2G2.2(b)(3)(B).

We rejected defendant's suggestion that this five-level enhancement applies only to a "bargained-for exchange or agreement between two or more traders in child pornography."  *Id.* at 1108–09.  We noted that the Guidelines commentary defines the language of the enhancement as "*any transaction*, including bartering or other in-kind transaction, that is conducted for a thing of value, but not for profit."  *Id.* at 1108 (emphasis added) (quoting U.S.S.G. § 2G2.2 cmt. 1) (internal quotation marks omitted).  And, looking to *Shaffer*'s interpretation of the term

-16-

"distribution" in 18 U.S.C. § 2252A, we opined that this form of "distribution" "easily falls within the meaning of the word 'transaction' [under § 2G2.2(b)(3)(B)]." *Id.* at 1109. Where a defendant makes files accessible to others through a file-sharing program, we reasoned, he presents the material for others to obtain, and thus engages in a "transaction," as this term includes an "act or an instance of conducting business or other dealings" and an "activity involving two or more persons." *Id.* at 1109 (quoting Black's Law Dictionary (8th ed. 2004)) (internal quotation marks omitted). *Id.*

Because the *Geiner* defendant "d[id] not dispute that he attempted to distribute child pornography within the meaning of § 2252A," we concluded that "his conduct . . . also constitutes a 'transaction' as that term is used in the application note to U.S.S.G. § 2G2.2." *Id.* at 1110 (citation omitted). Significantly, in doing so, we observed that distribution under § 2G2.2(b)(3) is defined "more broadly than our interpretation of the term under § 2252A [in *Shaffer*]." *Geiner*, 498 F.3d at 1109 n.5. We had no occasion, however, to examine "this broader definition of 'distribution'" in analyzing the scope of the term "transaction" found in the Guidelines commentary relating to § 2G2.2(b)(3)(B). *Id.* (internal quotation marks omitted)

Mr. Ramos's argument appears to be that his conduct did not constitute distribution under § 2G2.2(b)(3) because—unlike the defendants in *Shaffer* and *Geiner*—Mr. Ramos did not engage in an affirmative act to effect the sharing of

-17-

his child pornography files because such files were automatically downloaded into shared folders by the eMule program. As may be readily apparent from our description of *Shaffer* and *Geiner*, however, those two cases are legally inapposite. The legal outcomes of the two cases do not turn in any respect on the meaning of "distribution" under § 2G2.2(b)(3). Indeed, *Shaffer* did not address the meaning of that term under the Guidelines at all. *Shaffer* considered the meaning of "distribut[ion]" under 18 U.S.C. § 2252A. *See Shaffer*, 472 F.3d at 1220. In *Geiner*, moreover, the meaning of "distribution" under § 2G2.2(b)(3) also was not at issue because the defendant conceded that he engaged in such distribution, *Geiner*, 498 F.3d at 1106, and in resolving the question before it, related to the five-level enhancement under § 2G2.2(b)(3)(B), the court found it sufficient to employ *Shaffer*'s interpretation of the *statutory term* "distribution," *id.* at 1109–10. And, significantly, the *Geiner* court observed that the statutory term has a distinct meaning and is not as broad as the same term under § 2G2.2(b)(3)—*viz.*, it is not as broad as the term "distribution" at issue here. Accordingly, *Shaffer* and *Geiner* are legally inapposite: their outcomes do not turn on the meaning of "distribution" in § 2G2.2(b)(3), and their focus is on the admittedly narrower term "distribution" found in 18 U.S.C. § 2252A.

Furthermore, even assuming *arguendo* that the government was obliged to demonstrate that Mr. Ramos engaged in an affirmative act to prove that he distributed child pornography under § 2G2.2(b)(3), it did so by a preponderance

of the evidence—albeit under different factual circumstances than in *Shaffer* and *Geiner*. The government established that Mr. Ramos continued to download child pornography after becoming aware that the pornography would be accessible to other Internet users in his shared folders through the automatic operation of his eMule program—even if accessible for only a short time. *Cf. Shaffer*, 472 F.3d at 1224 ("[The defendant] could have, but did not, save the illicit images and videos in a computer folder not susceptible to file sharing. Likewise, he could have, but did not, activate the feature on Kazaa that would have precluded others from taking materials from his shared folder."). More specifically, the government offered evidence of a concrete instance of this affirmative conduct, where Mr. Ramos initiated the download of a child-pornography file that he knew would be automatically saved into shared folders by his eMule program and that child-pornography file was accessible to, and observed by, German law enforcement over the course of several days. Thus, the fact that eMule does not include an option for completely limiting sharing—like Kazaa in *Shaffer*—does not alter our conclusion that Mr. Ramos engaged in an affirmative act related to the transfer of child pornography.

Irrespective of whether it was Mr. Ramos's subjective desire to prevent sharing of his child pornography, it is indisputable that, by using eMule, Mr. Ramos foreclosed that option. As he admits in his brief, "[w]hile material is being downloaded [on eMule] . . . [,] it is also available to other computers,"

Aplt. Opening Br. at 10, and "[t]here [i]s no . . . selection available under eMule" to prevent the sharing, *id.* at 13; *see also id.* at 12 ("Mr. Ramos could not download the material into folders which were not accessible to others online."). A defendant's inability to adjust a peer-to-peer file-sharing program's default settings to prevent sharing cannot provide an effective safe harbor for that defendant's continued use of the network to violate the law. More specifically, while other file-sharing software may permit the user to completely block third-party sharing, eMule does not, and Mr. Ramos's purported personal desire not to share is irrelevant under these circumstances. This is so because even if (as he claims) Mr. Ramos actively attempted to remove child-pornography files from the shared folders, Mr. Ramos continued to use eMule with knowledge that the program was designed to permit other users to access his downloaded files. In sum, even assuming that it was required, the government offered evidence that Mr. Ramos engaged in a culpable affirmative act.

Accordingly, we conclude that the district court did not err in applying the enhancement under § 2G2.2(b)(3)(F), and refusing to otherwise reduce Mr. Ramos's offense level, because he "distributed" child pornography within the meaning of the Guidelines.

**B**

Section 2252(b)(1) of Title 18 provides a mandatory-minimum sentence of five years' imprisonment for "receipt" of child pornography. However, a similar

mandatory-minimum penalty does not affix to a conviction for "possession" under 18 U.S.C. § 2252(a)(4). *See* 18 U.S.C. § 2252(b)(2). Mr. Ramos argues that the mandatory-minimum sentence for receipt violates the Equal Protection Clause because there is no meaningful distinction between receipt and possession, yet (irrationally) the two are punished differently. He also contends that the mandatory minimum "interrupts the District Court's ability to fashion an appropriate sentence . . . in violation of the Sixth Amendment" and the Supreme Court's dictate in *Booker*. Aplt. Opening Br. at 19. The district court rejected these arguments on the merits.

We generally review constitutional challenges to a statute de novo. *See United States v. Dorris*, 236 F.3d 582, 584 (10th Cir. 2000). However, we do not reach the merits of Mr. Ramos's challenges. Specifically, we hold that Mr. Ramos lacks standing to assert his challenges because his sentence was not affected by § 2252(b)(1)'s five-year mandatory minimum—*viz.*, § 2252(b)(1)'s mandatory-minimum provision did not have a causal effect on Mr. Ramos's actual sentence (i.e., did not cause his sentencing injury).

The requirements of Article III standing are well-settled. In brief, there must be a showing of "[an] injury in fact, traceability, and redressability." *Coll v. First Am. Title Ins. Co.*, 642 F.3d 876, 892 (10th Cir. 2011) (quoting *S. Utah Wilderness Alliance v. Office of Surface Mining Reclamation and Enforcement*, 620 F.3d 1227, 1233 (2010)) (internal quotation marks omitted); *see also Turner*

-21-

*v. McGee*, 681 F.3d 1215, 1218 (10th Cir. 2012) ("To establish Article III standing, a plaintiff must demonstrate that he has satisfied each of three 'irreducible constitutional' elements. Specifically, the plaintiff must show that: (1) he has suffered an 'injury in fact'; (2) the injury is 'fairly traceable' to the complained-of conduct; and (3) it is 'likely as opposed to merely speculative that the injury will be redressed by a favorable decision.'" (citation omitted) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992))).

Of particular relevance here, the traceability component of the standing test contemplates "a causal relationship between the injury and the defendants' challenged acts." *PeTA, People for the Ethical Treatment of Animals v. Rasmussen*, 298 F.3d 1198, 1202 (10th Cir. 2002); *see Bronson v. Swensen*, 500 F.3d 1099, 1109 (10th Cir. 2007) ("The principle of causation for constitutional standing requires a plaintiff's injury to be 'fairly traceable to the challenged action of the defendant[.]'" (emphasis omitted) (quoting *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1156 (10th Cir. 2005))); *cf.* 13A Charles Alan Wright, et al., *Federal Practice & Procedure* § 3531.5, at 36 n.21 (3d ed. Supp. 2012) ("The standing requirement that injury be fairly traceable to the complained-of conduct is not equivalent to a requirement of tort causation. Something less than the tort concept of proximate cause is required. Traceability does not require that the defendants be the *only cause* of the injury." (emphasis added)).

"The standing Article III requires must be met by persons seeking appellate

-22-

review, just as it must be met by persons appearing in courts of first instance." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 64 (1997); *accord Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1159 (10th Cir. 2011); *see Fla. Wildlife Fed'n, Inc. v. S. Fla. Water Mgmt. Dist.*, 647 F.3d 1296, 1302 (11th Cir. 2011) ("If at any point in the litigation the plaintiff ceases to meet all three requirements for constitutional standing, the case no longer presents a live case or controversy, and the federal court must dismiss the case for lack of subject matter jurisdiction."). "To have standing, one must be aggrieved by the order from which appeal is taken." *Uselton v. Commercial Lovelace Motor Freight, Inc.*, 9 F.3d 849, 854 (10th Cir. 1993); *see Raley v. Hyundai Motor Co.*, 642 F.3d 1271, 1275 (10th Cir. 2011) ("[T]hese individuals possess Article III standing in the sense that they have been injured by a district court ruling and a favorable decision on appeal would ameliorate that injury."). "Just like litigants generally cannot bring suit to vindicate the rights of others, parties generally do not have standing to appeal in order to protect the rights of third parties." *Thomas*, 631 F.3d at 1159 (citation omitted).

The parties here did not address standing in their initial round of briefing. However, standing is a question of "justiciability [that] implicates this court's jurisdiction"; consequently, where the record reveals a colorable standing issue, we have a "duty to undertake an independent examination" (*sua sponte* if necessary) of that issue. *Morgan v. McCotter*, 365 F.3d 882, 887 (10th Cir.

-23-

2004); *see Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1181

(10th Cir. 2010) ("Although this question [i.e., standing] was not raised by the

parties nor addressed by the district court, we raise this issue *sua sponte*, as we

must[.]"); *City of Colo. Springs v. Climax Molybdenum Co.*, 587 F.3d 1071,

1078–79 (10th Cir. 2009) ("The federal courts are under an independent

obligation to examine their own jurisdiction, and standing is perhaps the most

important of the jurisdictional doctrines." (quoting *FW/PBS, Inc. v. City of*

*Dallas*, 439 U.S. 215, 231 (1990)) (internal quotation marks omitted), *overruled*

*on other grounds by City of Littleton v. Z.J. Gifts D-4, LLC*, 541 U.S. 774, 774–75

(2004)).

Where constitutional challenges are at issue, this judicial duty certainly is

no less stringent, for federal courts have an historic obligation to avoid

unnecessarily deciding constitutional questions. As the Supreme Court stated:

> Federal courts are courts of limited jurisdiction. They have the
> authority to adjudicate specific controversies between adverse
> litigants over which and over whom they have jurisdiction. In the
> exercise of that authority, they have a duty to decide
> constitutional questions when necessary to dispose of the
> litigation before them. But they have an equally strong duty to
> avoid constitutional issues that need not be resolved in order to
> determine the rights of the parties to the case under
> consideration.

*Cnty. Court of Ulster Cnty. v. Allen*, 442 U.S. 140, 154 (1979). To assist us in

carrying out our independent examination, we paused to solicit supplemental

briefs from the parties regarding our Article III jurisdiction and, in particular, the standing issue. *See City of Hugo v. Nichols (Two Cases)*, 656 F.3d 1251, 1255 (10th Cir. 2011) ("The standing requirements rooted in Article III apply equally on appeal as they do in the district court. Accordingly, this court ordered the parties to submit supplemental briefs addressing whether either appellant has standing." (citation omitted)); *cf. Schmeling v. NORDAM*, 97 F.3d 1336, 1338 n.1 (10th Cir. 1996) ("In certain circumstances, we might request additional briefing before deciding a jurisdictional question not squarely raised by the parties, but in this case, we see no need to do so.").

Turning to the standing question, we are guided by the Supreme Court's words in *Allen*:

> A party has standing to challenge the constitutionality of a statute only insofar as it has an adverse impact on his own rights. As a general rule, if there is no constitutional defect in the application of the statute to a litigant, he does not have standing to argue that it would be unconstitutional if applied to third parties in hypothetical situations.

442 U.S. at 154–55 (citation omitted). Consistent with these thoughts, the Court previously has stated, "Embedded in the traditional rules governing constitutional adjudication is the principle that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court." *Broadrick v. Oklahoma*, 413 U.S. 601, 610 (1973).

In the criminal sentencing context, these principles would seemingly lead to the conclusion that a defendant does not have standing to mount a constitutional challenge to the application of a statute, if that application did not adversely affect his sentence—that is, cause his sentencing outcome (i.e., his sentencing injury). Employing similar reasoning, we previously have rejected on standing grounds a federal criminal defendant's constitutional equal-protection and due-process challenges to 21 U.S.C. § 841(b), which were based upon the assertion that the statute's "classification scheme is not rationally related to its alleged congressional purpose of punishing drug 'kingpins' because the scheme uses the weight of the mixture containing the cocaine and heroin rather than the weight of the drugs if they were separated out of the mixture." *United States v. Mendes*, 912 F.2d 434, 438 (10th Cir. 1990). The record reflected that Mr. Mendes's sentence was based upon his possession of sizable quantities of cocaine and heroin that were, respectively, 92% and 47% pure. *Id.* at 439. In light of this fact, we held that Mr. Mendes "lack[ed] standing to challenge the facial validity of section 841(b) based on speculation about an extraordinary hypothetical situation involving small amounts of illegal drugs highly diluted in a mixture or inert medium." *Id.* at 440. In other words, by offering a fanciful hypothetical—that did not resemble his own situation—Mr. Mendes had not established that the purported constitutional defect in the statute adversely impacted his own rights, or caused his sentencing injury. Consequently, he

-26-

lacked standing.  *See also United States v. Zavala-Serra*, 853 F.2d 1512, 1517

(9th Cir. 1988) (noting that a defendant "must confine his constitutional attack to

the circumstances of his own case").

Similarly, a few of our sister circuits have rejected on standing grounds

constitutional challenges to the mandatory-minimum sentences prescribed by

certain drug statutes, where those courts have concluded for varying reasons that

the defendants' *actual sentences* were not adversely affected by the statutorily

prescribed mandatory minimums.  *See United States v. Gray*, 577 F.3d 947,

950–51 (8th Cir. 2009) (holding that "[defendant's] sentence was unaffected by

the [60-month] statutory minimum sentence" where "the district court imposed a

sentence ten months above the 60-month mandatory minimum" and, as such, "the

[district] court's sentencing decision was not constrained by [the mandatory

minimum]"); *United States v. Robinson*, 241 F.3d 115, 122 (1st Cir. 2001) ("The

principal problem with the appellant's thesis is that she lacks standing to mount

the challenge.  Her sentence was not premised on the five-year mandatory

minimum set out in section 841(b)(1)(B), but, rather, on the applicable sentencing

guidelines."); *United States v. Johnson*, 886 F.2d 1120, 1122 (9th Cir. 1989)

("[Defendants], who were sentenced to eight and ten years respectively, were not

affected by the [five-year] mandatory minimum provision of the statute. They

lack standing to challenge that aspect of [21 U.S.C.] § 841(b)(1)(B)."); *see also

United States v. Scott*, 627 F.3d 702, 705 (8th Cir. 2010) ("Because [the

defendant's] sentence was unaffected by section 841(b)(1)(B)(iii), . . . [he] lacks standing to challenge the constitutionality of the statute."); *cf. Zavala-Serra*, 853 F.2d at 1517 ("His only claim is that it would be [constitutionally] irrational to deny parole to defendants less culpable than himself. [Defendant] lacks standing to make this argument."); *United States v. Bullard*, 645 F.3d 237, 246 (4th Cir. 2011) (noting that "courts typically decline to recognize standing" where a defendant's sentence would not change "if he prevailed on his statutory claim").

While the universe of such cases is comparatively small and the reasoning underpinning these cases is not extensive, the standing defect that is most easily identified in their analyses is one of traceability (i.e., causation).[4] *See Scott*, 627

---

[4] We acknowledge that there may well be other standing defects in such circumstances. For example, traceability and redressability are "often closely related," although they "remain distinct and must be separately met." *Habecker v. Town of Estes Park*, 518 F.3d 1217, 1224–25 (10th Cir. 2008); *see Allen v. Wright*, 468 U.S. 737, 753 n.19 (1984) ("The 'fairly traceable' and 'redressability' components of the constitutional standing inquiry were initially articulated by this Court as 'two facets of a single causation requirement.' To the extent there is a difference, it is that the former examines the causal connection between the assertedly unlawful conduct and the alleged injury, whereas the latter examines the causal connection between the alleged injury and the judicial relief requested." (citation omitted) (quoting C. Wright, *Law of Federal Courts* § 13, at 68, n. 43 (4th ed. 1983))). Consequently, it should not be surprising that at least one circuit seems to have viewed the standing concern in a similar factual context as being principally one of redressability. *See Bullard*, 645 F.3d at 246 ("When a defendant seeks to challenge a sentencing statute, the inquiry focuses on whether the defendant's sentence might change if he prevailed on his statutory claim. If not, courts typically decline to recognize standing, as the defendant lacks any redressable injury."). In light of our causation-based standing analysis, we have no need to definitively rule on whether *other* standing defects might be present

(continued...)

F.3d at 705; *Gray*, 577 F.3d at 950; *see also Zavala-Serra*, 853 F.2d at 1517–18; *Robinson*, 241 F.3d at 122. These courts appear to have reasoned that in circumstances where a defendant has not demonstrated that his actual sentence—as opposed to some hypothetical sentence—is adversely affected by the mandatory minimum, then the defendant "has not demonstrated a causal connection between his injury (i.e., his sentence) and the mandatory minimum sentence." *Scott*, 627 F.3d at 705. One might cogently argue in this context that because "the court's sentencing decision was not constrained," *Gray*, 577 F.3d at 950, by the mandatory minimum—because, for example, the court did not adhere to the mandatory minimum, but rather imposed a sentence *above* it—then the mandatory minimum did not cause the defendant's injury (i.e., his actual sentence). *See also* 13A Charles Alan Wright, et al., *supra* § 3531.5, at 333–34 (3d ed. 2008) ("[S]tanding may be defeated by finding a different cause [of the injury-in-fact].").

Guided by the foregoing authorities, we conclude that Mr. Ramos lacks standing to assert his constitutional sentencing challenges because his sentence was not affected by § 2252(b)(1)'s five-year mandatory minimum—that is, the mandatory minimum did not cause his sentencing injury. In this case, the PSR calculated Mr. Ramos's Guidelines range at 210 to 240 months, based on a total

---

[4](...continued)
under factual circumstances such as those here.

offense level of thirty-seven and a criminal history category of I. As noted, however, the district court sustained many of Mr. Ramos's objections—several unrelated to the issues on appeal—ultimately arriving at a Guidelines range of seventy to eighty-seven months. It imposed a sentence at the top of that range, considering "the factors set forth in [18 U.S.C.] § 3553 and all the other information . . . presented." R., Vol. 1, at 434. The district court imposed a sentence that was more than two years above the five-year statutory minimum of 18 U.S.C. § 2252(b)(1). In fact, the bottom of the Guidelines range—upon which the sentence was based—was itself ten months above the mandatory-minimum term. Thus, Mr. Ramos's actual sentence of eighty-seven months was not affected by the statutorily prescribed mandatory minimum. In particular, the mandatory minimum did not constrain the district court's sentencing discretion. The court based Mr. Ramos's sentence on its consideration of the § 3553(a) factors and the Guidelines—not the mandatory minimum.

Nevertheless, Mr. Ramos contends that the five-year mandatory minimum for receipt of child pornography affected his sentence because the receipt crime yields a higher Guidelines base offense level than the comparable offense-level for possession of child pornography, which does not carry a five-year mandatory minimum (specifically, a Guidelines base offense level for possession of eighteen), and yet, "receipt is the equivalent of possession and there is no difference." Aplt. Supp. Br. at 4. As the government suggests, for at least a

couple of reasons, this argument is untenable.

First, Mr. Ramos has not even begun to establish a nexus between the base offense level prescribed by the Sentencing Commission and the five-year statutory mandatory minimum. The Sentencing Commission retains the unique function of providing an "expert assessment of appropriate sentencing practices," a process "often informed by empirical data regarding actual sentencing." *United States v. McBride*, 633 F.3d 1229, 1232 (10th Cir. 2011); *see United States v. Bistline*, 665 F.3d 758, 763–64 (6th Cir. 2012). The higher base offense level assigned to the receipt offense could very well reflect the Sentencing Commission's independent view that receipt of child pornography is more worthy of punishment than possession of child pornography—that is, evince the Commission's independent policy determination that, with respect to culpability, the two forms of conduct are *not* in fact equivalent. *Cf. United States v. Garner*, 490 F.3d 739, 743 (9th Cir. 2007) ("[T]he Sentencing Commission could easily have a rational basis for increasing the sentences of defendants who have previously sexually abused or exploited children, and then later receive, possess, or distribute material involving the sexual exploitation of children, even if years later."); *United States v. Meskini*, 319 F.3d 88, 92 (2d Cir. 2003) ("[T]he Sentencing Commission had a rational basis for creating a uniform criminal history category for all terrorists under § 3A1.4(b), because even terrorists with no prior criminal behavior are unique among criminals in the likelihood of

-31-

recidivism, the difficulty of rehabilitation, and the need for incapacitation.").

Mr. Ramos has not marshaled any arguments to the contrary. And, if the receipt base offense level does reflect the Sentencing Commission's independent judgment, then even if the Commission were wrong in establishing that level (a matter that is not before us), the base offense level still would *not* be a byproduct or function of Congress's five-year mandatory-minimum sentence. To put it another way, assuming that the Commission exercised its independent policy judgment in setting the higher base offense level for receipt, it could not be said to have adopted that offense level *because* Congress elected to impose a five-year mandatory minimum on the receipt offense. And Mr. Ramos has not given us any basis to believe that the Sentencing Commission did not in fact independently exercise its judgment in this manner. In any event, Mr. Ramos has completely failed to establish a nexus between the higher Guidelines base offense level for receipt and the five-year mandatory minimum of § 2252(b)(1). *See Raley*, 642 F.3d at 1275 ("Where an appellant fails to lead, we have no duty to follow. It is the appellant's burden, not ours, to conjure up possible theories to invoke our legal authority to hear her appeal.").

Furthermore, as the government notes, absent any upward adjustments, a defendant with Mr. Ramos's criminal history (i.e., a criminal history category of I), who is assigned a base offense level of twenty-two, would be in a Guidelines

range *below* the five-year mandatory minimum—specifically, a range of forty-one to fifty-one months. Therefore, "the base offense level of 22 was not tethered in any way to a term of months equating to five years' custody." Aplee. Supp. Br. at 11.

In addition, Mr. Ramos contends that "the mandatory minimum statute *could have* affected the Court's sentence by setting a basement number, 60 months, which formed the lowest point in the analysis and the starting point for the district court's evaluation." Aplt. Supp. Br. at 5 (emphasis added). However, Mr. Ramos's argument is purely conjectural. There is not the slightest indication in the record that the five-year mandatory minimum affected the district court's exercise of its sentencing discretion and resulted in the court giving Mr. Ramos a higher sentence than it otherwise would have. *See* Aplee. Supp. Br. at 11 ("[T]he district court showed no inclination whatever to sentence the defendant to a sentence below 87 months, even though it could have imposed a sentence of 60 months. This constitutes conclusive evidence that the five-year mandatory minimum had *nothing* to do with the defendant's sentence."). Indeed, Mr. Ramos acknowledges in his supplemental brief that the district court relied upon the Guidelines in fashioning his sentence. *See* Aplt. Supp. Br. at 5 ("Admittedly there is no indication in the district court's decision that the court did anything other than measure the parties' arguments all limited to calculating the guideline range and then deciding upon a number within that range."). Accordingly, we

-33-

conclude that Mr. Ramos's argument is without merit.[5]

For the foregoing reasons, we conclude that Mr. Ramos cannot establish standing to present his constitutional challenges to the five-year mandatory minimum of § 2252(b)(1). He has not established that his sentence was affected by application of that mandatory minimum.

## III

In sum, we **AFFIRM** Mr. Ramos's sentence in part, rejecting his Guidelines-based challenge, and **DISMISS** the appeal in part, holding that we do not have subject-matter jurisdiction over Mr. Ramos's constitutional challenges.

---

[5]     We do not foreclose the possibility that, even if the court ultimately imposes a sentence above the mandatory minimum, a defendant might be able to properly establish that his sentence was substantially and decisively affected by it. However, we need not opine on such a hypothetical situation. Here, it is clear that Mr. Ramos has failed to establish a legally cognizable nexus between his actual sentence and the five-year mandatory minimum.